FILED

2005 Feb-22  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GWENDOLYN B. PARKER,           }
                               }
      Plaintiff,               }
                               }     CIVIL ACTION NO.
v.                             }     04-AR-0638-S
                               }
ST. VINCENT'S HOSPITAL,        }
                               }
      Defendant.               }

―――――――――――――――― **MEMORANDUM OPINION** ――――――――――――――――

Before the court is the motion for summary judgment of defendant, St. Vincent's Hospital ("St. Vincent's"), pursuant to Rule 56(c), F.R.Civ.P.  Plaintiff, Gwendolyn Parker ("Parker"), commenced this action against her former employer by filing her complaint on March 29, 2004, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5, *et. seq.*, and 42 U.S.C. § 1981.  Parker, who is black, alleges that St. Vincent's failed to promote her to a supervisor position and later terminated her on account of her race.  She further alleges that St. Vincent's failure to promote and its ultimate decision to terminate her were in retaliation for her prior complaints of race discrimination.

After the close of discovery, on December 30, 2004, St. Vincent's filed the instant motion for summary judgment.  For the reasons that follow, the court will deny St. Vincent's motion.

### *Summary Judgment Facts*[1]

Parker worked for St. Vincent's as a nurse in its cardiology department from September 1988 until July 2002. From September 1999 until August 2000, Parker was the night shift charge nurse on 5 West, which is a branch of St. Vincent's cardiology department. At all other times during her employment with St. Vincent's, Parker was a staff nurse.

As a staff nurse on 5 West, Parker reported directly to the day shift charge nurse, Kris Love ("Love"), who is white. Several of Parker's annual performance reviews indicate that she needed improvement regarding tardiness and attendance, and she also received several written tardiness warnings. By and large, however, her performance reviews were positive, and there is no dispute that she was an excellent nurse, both in terms of clinical skill and patient care. In fact, in the annual performance review immediately preceding her termination, Modella Womack ("Womack"), the night shift charge nurse on 5 West, referred to Parker as "an extraordinary leader" and an "unparalleled clinician."

---

[1]Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

The Promotion

In March 2001, Chris Campanotta ("Campanotta") became the cardiology services manager at St. Vincent's.  One of his duties in this position was to supervise the nursing staff on 5 West, including Parker.  In May 2002, a patient care supervisor position opened on 5 West.  Campanotta, consistent with St. Vincent's procedures, got approval to fill the position and posted the job for three days internally.  During this time, Parker, Casi Bunn Dubose ("Dubose"), who is white, and Eunice Heflin ("Heflin"), who is black, applied for the position. According to Campanotta's testimony, he did not know that anyone other than Dubose had applied and he decided to give her the position.

Then, according to Parker's testimony, Campanotta called Parker aside and asked her to assist in training Dubose, at which point Parker told Campanotta that she had applied and did not even get an interview.  Campanotta responded that he did not know that Parker had applied, but that he would not have chosen her for the position anyway.  Parker told him she would be contacting personnel to see why she was not given an interview, and she told Julia Embry ("Embry") in the personnel department about the matter.

Embry called a meeting between Player, Parker, Dubose, Campanotta, and herself.  As a result of the meeting, the

3

promotion offer to Dubose was rescinded and a committee consisting of Campanotta, Cheryl Rutledge ("Rutledge"), the nurse supervisor in the cardiology department, and Joylene Simon, a black nurse, was formed to interview all three applicants for the patient care supervisor position.  Parker objected to Campanotta being on the committee because he had already told her he would not have hired her for the position even if he had known she applied.

Parker testified that Campanotta stated in her interview that she had a disciplinary problem.  After interviewing all three applicants, the committee unanimously decided to give the position to Dubose.  It is undisputed that Parker had much more nursing experience than Dubose.  It is further undisputed that Parker was qualified for the position.  The interview committee members' stated reasons for choosing Dubose over Parker included Parker's tardiness, Dubose's ability to discuss an article on leadership she had recently read, and the perception that Dubose had undertaken more activities to impact departmental goals than Parker or Heflin.

Following this interview, Parker filed an internal grievance.  St. Vincent's response was to schedule a meeting between Parker, Embry, the committee, Joel Windham ("Windham"), vice president of human resources, and Cindy Williams ("Williams"), vice president of patient care services.  At this

4

meeting, Windham questioned Campanotta about whether Parker had documented disciplinary issues. Campanotta admitted that there was no such documentation and explained that he understood that Parker had disciplinary problems. It was decided at this meeting that Parker should be given another interview for the position.

Windham and Williams conducted this second interview on July 3, 2002. During this interview, Parker told Windham and Williams that she believed Campanotta was biased on account of race. When pressed on the point, Parker said that Campanotta treated employees differently because of their race, citing as an example favorable treatment she believed he had given white employees with regard to shift scheduling. At the conclusion of this interview, Windham and Williams told Parker that she would hear from them the following week.

According to Windham and Williams' affidavits, they decided after the interview to offer Parker the promotion to patient care supervisor. They further state by affidavit that they did not inform Campanotta of this decision, and that he confronted them with an issue regarding Parker's payroll records before they announced their decision.

The Time Clock Entry

On July 4, 2002, Parker was scheduled to work a morning shift. Hourly employees at St. Vincent's use badges that they are supposed to carry with them to clock-in. An employee simply

5

swipes her badge through a machine that enters that moment as the employee's start time, and the employee repeats the process when she wants to clock-out.  If, for whatever reason, an employee does not clock-in or clock-out with the badge, then supervisors have personalized codes that they can use to make a computer entry that will change the employee's payroll record to reflect the omitted clock-in or clock-out.

Parker did not have her badge when she arrived at work on July 4, 2002, and so she did not clock-in at that time.   At some point on July 5, 2002, a manual computer entry was made to enter Parker's time for the previous day.  This entry was made using Love's payroll access code.  Love was not at the hospital on July 4th or 5th, such that she could not have made this manual entry.

On Sunday, July 7, 2002, Womack came to the hospital to do payroll for 5 West.  Parker saw Womack doing payroll, and told Womack to look at the schedule and make sure that Parker got all her hours for July 4, presumably because Parker knew that she had not clocked in that day.  Parker admits that she knew both Womack and Love's payroll access codes, but she flatly denies having used Love's code to alter her time records for July 4, 2002.

The Investigation

Campanotta was out on vacation during the week of July 4, 2002.  When he returned on July 8, 2002, and reviewed the payroll prepared by Womack, he noticed something unusual about Parker's

time for July 4.  Upon further investigation, he discovered that
a manual entry had been made using Love's access code.  Such
entries were not unusual, but Campanotta took note of this
particular entry because he knew that Love did not work on the
day her code was used and because the payroll system could not be
accessed from a remote location.  He contacted the charge nurses,
Love and Womack, who both denied having knowledge of or
authorizing the manual entry.  Campanotta then requested that the
payroll department check on the entry and he notified Rutledge
and Williams of his concerns.

On July 10, 2002, Campanotta called Parker and told her the
committee had reached a decision regarding the patient care
supervisor position.  When Parker arrived at his office, Rutledge
and Embry were also there, and they asked her if she knew
anything about the manual time entry.  Parker immediately denied
having made the entry.  At the end of this meeting, Campanotta
told Parker they would have to investigate and that she was
suspended pending the investigation.

Termination

Less than a week later, Campanotta contacted Parker to tell
her the investigation was complete and to request a meeting with
her.  On July 17, 2002, Embry, Campanotta, and Rutledge met with
Parker and told her that she was being terminated for altering
her time record for July 4, 2002.  Campanotta, Rutledge, Windham

7

and Williams together made the decision to terminate Parker. Following this meeting, Parker filed a grievance contesting her termination.  In this grievance, she reiterated that other staff nurses had access to the codes, and she also claimed there was a "racial and gender divide" in the cardiology services department related to Campanotta's management.

In response, a meeting was held between Womack, Love, Williams, Windham, Embry, Rutledge, and Parker.  At that meeting, Womack stated that nurses other than the charge nurses knew the access codes, and she admitted giving Parker permission to use her payroll access code to do specific tasks. Love denied giving anyone her access code.  Parker has testified that Love was lying, and that she in fact had given Parker her code.  As a result of this meeting, St. Vincent's did not alter its earlier decision to fire Parker.

A second grievance hearing took place in August 2002 before a grievance committee.  This meeting was attended by, among others, Campanotta, Embry, and Parker.  At this meeting, Parker answered questions about her time records and again denied making the manual entry using Love's code.  After this meeting, Parker received a letter from St. Vincent's stating that the second grievance committee had upheld the decision to terminate her.

Parker's EEOC Charge

Shortly after learning of her termination, on July 19, 2002,

8

Parker filed a charge of discrimination with the EEOC.  In this initial charge, Parker alleged that St. Vincent's had fired her due to her race.  On August 7, 2002, she amended her charge to include a claim of race discrimination concerning her application for the patient care supervisor position.  Parker amended her charge again in December 2002, adding a retaliation claim arising out of her discharge.  She received her right to sue letter from the EEOC in January 2004, and filed her complaint in this court on March 29, 2004.

### *Analysis*

Failure to Promote

St. Vincent's argues that Parker's discriminatory failure to promote claims under Title VII and § 1981 are due to be dismissed because Parker has failed to establish a *prima facie* case and because she cannot show that St. Vincent's legitimate non-discriminatory reasons for failing to promote her were a pretext for race discrimination.[2]  To establish a *prima facie* failure to promote claim, a plaintiff must show that (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) either some equally or less qualified employee outside the protected class was promoted,

---

[2]Parker's § 1981 claims are subject to the same burdens of proof as her corresponding Title VII claims. See Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 293, n. 1. (11th Cir. 1998).

or the position remained unfilled and the employer continued to seek applicants of plaintiff's qualifications. *See Wall v. Trust Co. of Georgia*, 946 F.2d 805, 809 (11th Cir. 1991); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539, n. 11 (11th Cir. 1997).

The only real dispute between the parties is whether Parker was rejected. Significantly, there is no dispute that Parker was at least as qualified for the job as Dubose, the white nurse who was initially given the job by Campanotta, and was chosen again by the interview committee after Campanotta commented on the plaintiff's disciplinary problems and highlighted her tardiness issues for the committee.

St. Vincent's argument that Parker was not rejected seems, at first blush, to contradict the obvious.  After all, Parker is not currently employed as the patient care supervisor, and no one ever told her that she had been selected for the position.  St. Vincent's argues that the two times it rejected Parker and chose Dubose are legally insignificant because it had decided to give Parker the job just before the issue with her payroll records surfaced in July 2002.  The court rejects St. Vincent's argument, not because it is absolutely implausible, but because viewing the evidence in the light most favorable to Parker, there are genuine issues of material fact that prevent the conclusion that Parker was never rejected.

The promotion, or lack thereof, involved three related

decisions.  There is no dispute that the first two decisions
resulted in Dubose, not Parker, getting the job.  As to the first
decision, Campanotta testified that he did not know Parker had
applied for the position when he initially selected Dubose.  Even
so, when Parker confronted Campanotta, he said he would not have
hired her anyway, and an interview committee of which he was a
member subsequently gave Dubose the job over Parker.  If the
story ended there, it would be beyond dispute that Parker had
made out a *prima facie* case.  St. Vincent's is quick to point out
its version of the rest of the story, however, claiming that
Windham and Williams decided to give Parker the job, making the
two previous selections of Dubose legally ineffective because
Parker actually was going to be awarded the promotion before
suffering any tangible harm.  *See Pennington*, 261 F.3d 1262, 1267
(11th Cir. 2001).

According to St. Vincent's, but for the issues that
Campanotta raised concerning Parker's time records, she would
have gotten the job.  No one ever told Parker she had been
selected.  Williams and Windham testified by affidavit that they
made the decision to promote Parker after the July 3 interview,
but did not announce their decision, or tell anyone about it,
until at least July 8, 2002, when Campanotta confronted them with
the payroll issue.  Even then, according to Windham and Williams,
everyone except for Rutledge was kept in the dark about the fact

that Parker had actually been selected for the job.  At the very least, viewing the evidence in the light most favorable to Parker, St. Vincent's actions after it decided to promote Parker were inconsistent with the supposedly undisputed fact that Windham and Williams had selected her.  This inconsistency alone requires rejecting St. Vincent's argument that Parker had the job and thus cannot show she was rejected.

Moreover, because Williams and Windham did not ever announce their decision to give Parker the patient care supervisor job, it cannot fairly be said that their decision rescinded the interview committee's decision to reject Parker in favor of Dubose.  *See Pennington*, 261 F.3d at 1267 ("the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action").  In effect, Parker was rejected twice before Windham and Williams interviewed her.  Their affidavits detailing an unannounced decision to promote Parker do not change the net result of Parker's application, interview, and grievance process: she was rejected.

St. Vincent's points to Parker's tardiness, as well as the relative merits of Dubose as a leader compared to Parker, as legitimate, non-discriminatory reasons for the committee's decision to promote Dubose.  These reasons satisfy the minimal burden of production required to articulate a legitimate reason for failing to promote a plaintiff.  *See Chapman v. AI Transport*,

12

229 F.3d 1012, 1030 (11th Cir. 2000).

There are genuine fact issues precluding summary judgment, however, as to whether St. Vincent's articulated reasons are a pretext for race discrimination. *See Combs*, 106 F.3d at 1538. Viewing the evidence in the light most favorable to Parker, Campanotta made up his mind early in the process that Parker, who had nearly five times the number of years of nursing experience that Dubose had, should not get the patient care supervisor position. *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000)(recognizing that pretext can be shown by disparities in applicants' qualifications that "are so apparent as virtually to jump off the page and slap you in the face").  It is also clear that, despite a record of minor tardiness and attendance problems, Parker was an exceptional nurse and leader within the 5 West unit.

Based on the evidence, it is for the jury, not this court, to decide whether "to draw an inference of intentional discrimination." *Combs*, 106 F.3d at 1538.  Plaintiff has presented evidence from which a reasonable factfinder could conclude that St. Vincent's articulated reasons for not promoting Parker – her previous tardies and her inability to discuss an article on leadership – are "unworthy of credence." *Id.* Campanotta's initial decision, and subsequent efforts, to keep Parker from getting the patient care supervisor job beg the

question whether St. Vincent's articulated reasons should be disbelieved.  According to Parker's testimony, Campanotta also referred to a disciplinary problem that Parker had in front of the interview committee, although he would not go into detail regarding the problem and later admitted to Windham that he had no documentation of any disciplinary problem.  Because St. Vincent's cannot demonstrate the absence of genuine issues of material fact regarding its decision not to promote Parker, summary judgment is due to be denied on her failure to promote claims under Title VII and § 1981.

<u>Discharge</u>

If Parker's failure to promote claims did not provide a legitimate argument for a connection between the discharge decision and the failure to promote decisions, the undisputed evidence would require the court to grant St. Vincent's motion as to the discriminatory discharge claims.  In other words, without the additional facts of Parker's non-promotion and its possible relationship to her discharge, a reasonable factfinder could not conclude that St. Vincent's discriminated against Parker on account of race.  To establish a *prima facie* discriminatory discharge claim, a plaintiff must show that she is a member of a protected class, that she was qualified for the job from which she was fired, and that the misconduct for which she was discharged was nearly identical to that engaged in by an employee

14

outside the protected class who was retained.  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  Parker cannot point to a single white employee who was similarly suspected of using a supervisor's code to alter her time records.  Given this lack of a white comparator, and because there is no direct evidence of race discrimination, Parker's discriminatory discharge claims would fail as a matter of law but for the argument that the discharge was a way to accomplish the non-implementation of the promotion that St. Vincent's was about to give Parker and thus provides circumstantial evidence of discrimination.

Parker's arguments that many other non-supervisory employees knew the charge nurses' payroll access codes, that she did not in fact change her time records, and that she had seen Dubose accessing the payroll system would be unavailing if the discharge had not been preceded by the dispute over promoting her. Parker's testimony that she did not change her record arguably subtracts from Campanotta's credibility when he says Parker's race played no part either in his objection to Parker's promotion or his participation in the decision to fire her.

A critical question, of course, is whether St. Vincent's reasonably believed that Parker had committed the policy violation of which it accused her, not whether, in fact, Parker did it.  The undisputed evidence is that: (1) Parker knew Love's

access code; (2) Love's code was used on a day when she was not at St. Vincent's to change Parker's time; (3) Parker was at St. Vincent's when the change was made; and (4) Love could not have made the change because the payroll system cannot be accessed from a remote location.

The fact that Parker saw Dubose, a non-supervisory white employee using the payroll system, if Parker is being truthful, does not support an inference that St. Vincent's knew that Dubose was *mis*-using an access code and overlooked it.  In the first place, there is no evidence that Dubose was performing payroll tasks without express authorization.  And, even if she was, there is no evidence that St. Vincent's had actual knowledge of Dubose's unauthorized use of an access code, much less evidence of the sort it had that Parker misused a code.  It is not for the jury to decide whether St. Vincent's decision was a prudent one. Because the disputed evidence can lead to a conclusion that St. Vincent's reasonably could have believed that Parker misused a supervisor's access code, and was legitimately motivated by that belief to terminate her, or to a conclusion that the articulated belief was a pretext, St. Vincent's is not entitled to judgment as a matter of law on the discriminatory discharge claims.

In sum, because there is evidence from which the jury could conclude that St. Vincent's, through Campanotta, intentionally discriminated against Parker with regard to the promotion

decision, the same jury could conclude that the said racial animus continued and motivated Campanotta's participation in the related termination decision.  The absence of a white comparator does not defeat this reality.  The question on summary judgment is, and must remain, whether a factfinder could reasonably conclude that unlawful discrimination motivated the employer's actions.  The *McDonnell Douglas* framework should not be applied rigidly or mechanically, in a way that frustrates resolution of the ultimate question by the factfinder.

<u>Retaliation</u>

Parker's retaliation claims survive for the same reasons her discharge claims survive.  The court has some reservation about whether she engaged in statutorily protected activity, but giving her the benefit of the doubt on this threshold question, there is evidence upon which a factfinder could find that her termination was not wholly unrelated to such activity.  To the extent Parker may be contending that the failure to promote her was an act of retaliation, she fails to make the causal connection, making no real effort to argue for such a relationship.  The court will treat any such claim as having been abandoned.

17

### *Conclusion*

For the foregoing reasons, St. Vincent's motion for summary judgment will be DENIED by separate order.

DONE this 22nd day of February, 2005.

_____

WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE

18